# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 08 2019, 10:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Schrontz
Schrontz Legal Group, LLC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of R.W. (Minor Child) and<br><br>B.W. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner* | July 8, 2019<br><br>Court of Appeals Case No. 19A-JT-229<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Faith A. Graham, Judge<br><br>Trial Court Cause No. 79D03-1807-JT-114 |

**Crone, Judge.**

# Case Summary

[1] B.W. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor child, R.W. ("Child"). We affirm.

# Facts and Procedural History

[2] Child was born on June 24, 2017, to Mother.[1] Mother has a lengthy criminal history, and, although not incarcerated at the time of Child's birth, she had been arrested and posted bond just weeks before on charges of possession of paraphernalia, possession of methamphetamine, and forgery. On June 28, 2017, Child was removed from Mother's care and placed in protective custody due to allegations of Mother's drug use during her pregnancy. Child suffered from withdrawal symptoms at birth, and both Mother and Child tested positive for amphetamine and methamphetamine. Thereafter, the Indiana Department of Child Services ("DCS") filed a child in need of services ("CHINS") petition regarding Child.[2] Mother admitted the allegations in the CHINS petition, and, following a combined detention and initial hearing, the court continued the order for removal and ordered that Child remain in foster care.[3] The court

---

[1] A.R., the alleged father, failed to appear at the trial level despite proper notice. The trial court heard evidence and entered a default judgment against him terminating his parental rights. He does not participate in this appeal.

[2] Mother has a history of prior contacts with DCS as early as 2012 regarding an older daughter, J.A.O., due to Mother's drug use, her extensive criminal history, and ongoing domestic violence between Mother and a boyfriend. Mother retains her parental rights to J.A.O., but J.A.O. is placed with her maternal grandparents.

[3] The record indicates that Child's maternal grandparents declined placement of Child.

ordered Mother to submit to random drug screens and further ordered that she not be permitted to visit Child until she tested negative for methamphetamines. Referrals were made for Mother to participate in assessments and services. DCS found Mother difficult to contact, and she failed to complete any assessments or participate in any services.

[3] Mother was incarcerated in July 2017. Shortly thereafter, she was transferred to a work release program. While in custody, in December 2017, Mother completed a substance abuse assessment and mental health evaluation. She has been diagnosed with alcohol dependence. She reported a long history of substance abuse including alcohol, cannabis, cocaine, and ecstasy. She further reported that she had participated in intensive outpatient substance abuse treatment in 2013. Mother was diagnosed with generalized anxiety disorder, major depressive disorder, and other stimulant dependence. She disclosed that she continued to abuse alcohol, cannabis, and cocaine, and she further disclosed that she had used methamphetamine daily over the past five years.

[4] In August 2017, the trial court adjudicated Child a CHINS due to Mother's admitted drug use and issued interim orders for Mother to participate in services. A dispositional decree was entered in September 2017, ordering that Mother participate in services while in work release with the plan being reunification with Child. Mother failed to participate in services before or during her time in work release, and then she violated the conditions of work release in January 2018 by severing the strap on her ankle monitor. Mother was

arrested and incarcerated in February 2018. At the time of her arrest, she was found in possession of methamphetamine and buprenorphine.

[5] In June 2018, Mother was convicted of level 6 felony possession of methamphetamine, level 6 felony theft, and level 6 felony escape. She was also found to be a habitual offender. The trial court sentenced her to eight years, with two years suspended to probation. Mother was also sentenced on a probation violation. She was transferred to the Indiana Women's Prison on August 17, 2018. Since her arrival at the prison, Mother commenced and completed a parenting class, as well as participated in a culinary arts program and other self-help curricula involving methamphetamine addiction, anger management, overcoming anxiety, and developing effective communication. Mother's earliest possible release date is December 27, 2019; however, she has already received two conduct reports while incarcerated. Mother has had no contact with Child since Child's birth.

[6] In August 2018, DCS filed a petition to involuntarily terminate Mother's parental rights. After the termination hearing held on November 13, 2018, the trial court entered extensive findings of fact, one of which contained the following relevant summary:

> There have been repeated concerns regarding Mother's lack of stability, criminal activity, drug use, and domestic violence relationships with multiple DCS assessments. These issues have extended over several years and have now spanned the lives of both Mother's children. Mother's recent participation in services in prison does not outweigh Mother's lengthy history of failing to address these same issues before, during, and after the first

CHINS case or before incarceration and while on Work Release in the second CHINS case. Mother has displayed a long-term pattern of failing to comply with terms of sentencing and/or probation having been convicted of Escape on three (3) occasions. Mother has demonstrated little to no regard for the impact this continuous instability has on her children.

Appellant's App. Vol. 2 at 20.

[7] Accordingly, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied by Mother; (2) there is a reasonable probability that continuation of the parent-child relationship between Mother and Child poses a threat to Child's well-being; (3) termination of the parent-child relationship between Mother and Child is in Child's best interests; and (4) DCS has a satisfactory plan for Child's care and treatment, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate by clear and convincing evidence and therefore terminated Mother's parental rights. Mother now appeals.

## Discussion and Decision

[8] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all

other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[9] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to

the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Section 1 – Clear and convincing evidence supports the trial court's conclusion that there is reasonable probability of unchanged conditions.

[10]  Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal from and continued placement outside the home will not be remedied.[4] In determining whether there is a reasonable probability that the conditions that led to Child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to [her]

---

[4] Mother also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.* Accordingly, we will address only one of the three requirements.

placement and retention in foster care." *Id*. Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (citation omitted), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[11] Here, Child was initially removed from Mother's care after DCS received reports that Mother was using methamphetamines while pregnant, Mother tested positive for drugs upon admittance to the hospital, and Child displayed signs of withdrawal at birth. Mother was not incarcerated at the time, but shortly after Child's birth, Mother became incarcerated and was transferred to a work release program. Although Mother had a substantial prior history with

DCS involving her older daughter during which she failed to participate in offered services, DCS put numerous new services in place regarding Child that Mother could have participated in while in work release. Mother failed to complete any services and instead chose to violate work release and was again incarcerated. At the time of her latest arrest, Mother was found in possession of methamphetamine and buprenorphine.

[12] Mother asserts that she is currently sober (while incarcerated) and that the record reveals that she has completed some services while in custody, including completing a parenting class and participating in a culinary arts program. Accordingly, Mother essentially argues that the evidence of her good faith efforts at improvement coupled with her impending 2019 release date support a conclusion that there is a reasonable probability that conditions will change upon her release from incarceration. *See, e.g., K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015) (finding evidence insufficient to support trial court's conclusion that incarcerated Father would be unable to remedy conditions for removal; trial court failed to balance Father's recent improvements against his habitual patterns of conduct; Father had made substantial efforts toward bettering his life though programs available during his incarceration, including establishing regular visitation with minor children).

[13] We do not discount Mother's recent efforts, and, contrary to her assertions, neither did the trial court. The trial court did not ignore Mother's recent efforts and did not look simply to Mother's incarceration and her inability to currently parent Child. Rather, the trial court considered Mother's prior numerous

contacts with DCS, as well as her lengthy and extensive criminal history, and determined that Mother's past behavior was more indicative of her future behavior than her minimal recent improvements while incarcerated. "We entrust th[is] delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[14] There is ample evidence that Mother began choosing criminal activity and drug use over the needs of her older daughter as early as 2012. Despite numerous opportunities over the last several years to alter her behavior and to cooperate with those providing social services, Mother chose to continue her negative behavior even after the birth of Child and a second CHINS case. Again, Mother's efforts while incarcerated, while commendable, were not substantial when compared with her habitual patterns of conduct. Under the circumstances, the trial court was well within its discretion in determining that there is a substantial probability of future neglect or deprivation based upon Mother's long-term pattern of behavior. The trial court's conclusion that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside the home will not be remedied is supported by clear and convincing evidence.

## Section 2 – Clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in Child's best interests.

[15] Mother next challenges the trial court's conclusion that termination of her parental rights is in Child's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. "[T]he historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[16] The original DCS family case manager, Christopher LaMar, opined that termination of Mother's parental rights is in Child's best interests. He noted that Mother failed to engage in any services prior to her incarceration while he was on the case. Similarly, the more recent DCS family case manager, Kourtney Wheeler, also opined that termination of Mother's parental rights was in Child's best interests because Child needs permanency. Wheeler noted

that Child had been in foster care her entire life and that Mother will continue to be incarcerated until at least the end of 2019. She emphasized that Mother and Child have zero bond because Mother has had no contact with Child since birth due to her drug use and continued criminal behavior.

[17] Court Appointed Special Advocate Brenda Parker also testified that she believed the best interests of Child would be served by termination of Mother's parental rights. Parker opined that Mother had not remedied the conditions that led to Child's placement outside of her care and that continuation of the parent-child relationship posed a threat to Child's well-being. Parker noted Mother's history with DCS and her long-term abuse of methamphetamine. Parker stated that Child "has been out of the home five hundred and six days. She has been with her foster parents five hundred and four days … that is all she knows as her family and as her parents." Tr. Vol. 2 at 58. Parker stated that Child had overcome "so many obstacles that she started out with" and was thriving in the care of her foster parents. *Id*. at 53. Parker was confident that adoption by Child's current foster family would be best for Child.

[18] As our supreme court has often stated, "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *K.T.K.*, 989 N.E.2d at 1230 (quoting *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). Clear and convincing evidence supports the trial court's conclusion that termination of Mother's rights is in Child's best interests.

## Section 3 – Clear and convincing evidence supports the trial court's conclusion that adoption is a satisfactory plan for the care and treatment of Child.

[19] Finally, Mother challenges the trial court's conclusion that there is a satisfactory plan for the care and treatment of Child. While the trial court must find that there is a satisfactory plan for the care and treatment of the child, "[t]his plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). Generally, adoption is a satisfactory plan. *Id.*

[20] It is clear from the trial court's findings that the permanency plan here is for Child to be adopted by her current foster family or by another adoptive family if the current foster family is unable to adopt for any reason. Thus, there is clearly a general sense of direction in which Child will be going after the parent-child relationship is terminated. The lion's share of Mother's argument against this plan is simply that the trial court should have given more consideration to "alternative options" to termination of parental rights such as "guardianship or third-party custody" with Child's maternal grandparents, as has been done with Mother's older daughter. Appellant's Br. at 34. However, the trial court specifically considered these options, but ultimately rejected them in favor of termination, and we must defer to the trial court's weighing of the evidence

here.[5]  Clear and convincing evidence supports the trial court's conclusion that adoption is a satisfactory plan for the care and treatment of Child.

[21]   Decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact sensitive. *E.M.*, 4 N.E.3d at 640. We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.  *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the trial court's termination of Mother's parental rights to Child was clearly erroneous.  Accordingly, the trial court's termination order is affirmed.

[22]   Affirmed.

Bradford, J., and Tavitas, J., concur.

---

[5] The trial court made detailed findings supporting its decision not to place Child with her maternal grandparents. Namely, the maternal grandparents adamantly declined placement of Child at the outset of the CHINS case and then, after later expressing some interest in placement, canceled multiple scheduled visits. Moreover, service providers noted that the maternal grandparents, especially maternal grandmother, exhibited little engagement with Child even during visits they attended.